UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASHRAF EBID,

        Plaintiff,                                Case No. 1:10-cv-1152

v.                                                 HON. JANET T. NEFF

GLOBAL FUTURES & FOREX, LTD.,

        Defendant.
_____/

**OPINION**

Plaintiff Ashraf Ebid filed this breach of employment contract action against Defendant Global Futures & Forex, Ltd. (also "GFF" or "the Company"), his former employer. The case was transferred from New Jersey District Court on November 22, 2010, following that court's Opinion and Order denying Defendant's motion to dismiss and granting Defendant's motion to transfer.

Pending before the Court is Defendant's Motion for Summary Judgment (Dkt 98). Plaintiff has filed a Response (Dkt 114), and Defendant has filed a Reply (Dkt 112). Having fully considered the parties' briefs and accompanying exhibits, the Court concludes that Defendant's Motion is properly denied.[1]

I. Background[2]

Defendant is a futures and on-line trading company that provides products and services to

---

[1] Pursuant to W.D. Mich. LCivR 7.2(d), the motion for summary judgment is decided without oral argument.

[2] The facts are set forth in this Opinion for purposes of resolving the motion for summary judgment and are not intended to be a resolution of any disputed facts.

both "institutional" and "retail" customers (Statement of Material Facts (SMF) ¶ 1).[3] Defendant is located in Grand Rapids, Michigan, but has branch offices in London, Dubai, Singapore and Tokyo (*id.* ¶ 2). Plaintiff was employed as a senior executive[4] for Defendant from late 2001[5] until his termination from employment on June 9, 2010[6] by Defendant's CEO and owner Gary Tilkin (*id.* ¶¶ 3, 5, 82). Plaintiff was initially hired pursuant to a written Employment Agreement, dated December 1, 2001, and signed by Plaintiff and Tilkin (SMF ¶ 8; Def. Br., Dkt 99, Ex. 1), which is at the core of the parties' dispute.

In key part, the Employment Agreement provides for Plaintiff's compensation based on a draw and commission plan, and for the payment of post-termination commissions for twelve months if Plaintiff is terminated without cause (SMF ¶ 11; Def. Br., Ex. 1 ¶¶ 3, 11). Post-termination commissions were to be paid only as to "round-turn lots traded" by accounts "procured" by Plaintiff prior to termination (SMF ¶ 11; Def. Br., Ex. 1 ¶ 11). The Agreement sets forth a lengthy description of acts constituting "cause," which includes but is not limited to, "pursuing Employee's own interests . . . to the detriment of the Employer," "making threats or engaging in abusive behavior toward any customer or employee," "using obscene or vulgar language towards any

---

[3]Defendant has submitted a SMF in numbered paragraphs (Dkt 120), and Plaintiff has submitted a responsive SMF in corresponding numbered paragraphs (Dkt 115). The Court's citation to the SMF refers to both parties' submissions, unless otherwise noted.

[4]The parties dispute Plaintiff's position title. Defendant asserts that at the time of his separation, Plaintiff's title was "Executive Vice President of Global Institutional Sales"; Plaintiff disagrees and states it was "Executive Vice President of Sales and New Business Development" (SMF ¶ 4).

[5]Defendant asserts Plaintiff began working for GFF in December 2001, but Plaintiff claims he began on November 13, 2001 (SMF ¶ 3).

[6]The SMF, to which both parties agree, incorrectly identifies the date as June 9, 2009 (SMF ¶ 3).

customer or employee," "failing or refusing to perform job duties as assigned," "insubordination," "unsatisfactory job performance as defined in this agreement," and "any other violation of company policy as set forth in the employee handbook" (SMF ¶ 12; Def. Br., Ex. 1 ¶ 11).  The parties disagree whether the compensation provisions in the Employment Agreement remained in effect at the time of Plaintiff's termination, and the extent to which they govern the instant dispute.

The parties agree that after Plaintiff was hired, his compensation was changed from the original draw and commission plan to a salary and bonus plan (SMF ¶¶ 16-18; Def. Br., Ex. 2).  The parties also agree that beginning in approximately December 2009 and continuing into 2010, Plaintiff negotiated with Tilkin regarding a new compensation plan (SMF ¶ 28).  The parties' view of the facts diverge beyond this point.

Plaintiff contends that his negotiations with Tilkin resulted in an oral agreement in April 2010, which modified the Employment Agreement and increased his salary to $600,000 per year retroactive to January 1, 2010; and entitled him to a share of GFF profits[7] of 10% of the first $50,000,000 of institutional profits, 5% on all institutional sales profits thereafter; and a share of profits on the remainder of the GFF profits (non-institutional) based on the then-existing percentages (Pl. Br. at 1-2).  Plaintiff also contends that he was terminated without cause and is entitled to post-termination commissions pursuant to the Employment Agreement.  Plaintiff asserts three claims based on his factual contentions:  (1) breach of contract, (2) violation of New Jersey Wage Payment Law, and (3) unjust enrichment, based on his written employment agreement and the alleged oral agreement with Tilkin.

---

[7]This share is variously described in the record as a "commission" (Compl. ¶ 14), "profit participation" (Pl. Br. at 1), "share of the profits of GFF" (Pl. Br., Ex. 1, Decl. of Ashraf Ebid ¶ 13) and a "bonus formula" (SMF ¶¶ 29, 30).

In direct contradiction, Defendant takes the position that the parties engaged in negotiations for several months regarding Plaintiff's compensation, and they reached agreement on a new salary, but not on any new bonus formula (Def. Br. at 5; Def. SMF ¶ 29). Defendant also contends that the factual record establishes that Plaintiff was terminated for cause and he is not entitled to the payment of any post-termination commissions.

## II. Legal Standard

A moving party is entitled to a grant of its motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). The court must consider the evidence and all reasonable inferences in favor of the nonmoving party. *Slusher v. Carson,* 540 F.3d 449, 453 (6th Cir. 2008); *Hamilton v. Starcom Mediavest Group, Inc.,* 522 F.3d 623, 627 (6th Cir. 2008). The initial burden is on the moving party to show that there is no dispute regarding any genuine issue of material fact. *Slusher,* 540 F.3d at 453. "Once the moving party supports its motion for summary judgment, the opposing party must go beyond the contents of its pleadings to set forth specific facts that indicate the existence of an issue to be litigated." *Id.* The ultimate inquiry is "whether the state of the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*[8]

---

[8]The parties dispute the applicable legal standard and, more specifically, its application, on the record before the Court. Given the numerous factual disputes, the Court need not resolve the dispute over the application of the legal standard because it is clear that under Rule 56, genuine issues of material fact preclude judgment as a matter of law. *See* FED. R. CIV. P. 56. For the same reason, the Court need not decide the parties' dispute concerning the propriety of considering Defendant's expert report.

III. Analysis

Defendant seeks summary judgment of Plaintiff's breach of contract claim on four grounds: (1) the claim for additional bonus compensation during the six months prior to termination is based on a bonus compensation proposal that was never agreed to by the Company; (2) the bonus formula that was allegedly agreed to is too indefinite to be enforced; (3) although the original employment agreement provided for the continuation of "commissions," in the event that Plaintiff was terminated for reasons other than "cause," that provision was no longer in effect at the time of Plaintiff's separation; and (4) Plaintiff was terminated "for cause" (Def. Br. at 1). Defendant argues that no jury could reasonably find in favor of Plaintiff with respect to his claim for breach of contract, and Plaintiff's remaining two claims fail as a matter of law.

Plaintiff argues that Defendant's factual contentions make it clear that numerous issues of material fact exist regarding Plaintiff's claims, which must be resolved by the jury. The Court agrees that many issues of material fact exist, precluding summary judgment.

A. Breach of Contract Claim

"The requirements and general Michigan common law governing oral contracts is the same as those governing written contracts." *King v. Triton Indus., Inc.,* No. 1:08-cv-1006, 2009 WL 4639334, at *10 (W.D. Mich. 2009) (citing *Warnes v. Brubaker,* 65 N.W. 276, 277 (Mich. 1897)). "'To establish a breach of contract, a plaintiff must establish both the elements of a contract and a breach of the contract.'" *King,* 2009 WL 4639334, at *10 (quoting *Slomka v. City of Hamtramck Hsg. Comm'n*, 2009 WL 1066918, at *1 (Mich. Ct. App. Apr. 21, 2009) (citation omitted)). "A valid contract requires (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *King* 2009 WL

4639334, at *10 (citing *Thomas v. Leja,* 468 N.W.2d 58, 60 (Mich. Ct. App. 1991) (citation omitted)).

Mutuality of agreement, commonly described as "a meeting of the minds," means that there must be a meeting of the minds on all the material facts in order to form a valid agreement; "a meeting of the minds" is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind. *Sanchez v. Eagle Alloy, Inc.*, 658 N.W.2d 510, 517 (2003) (citation omitted); *Kamalnath v. Mercy Mem'l Hosp. Corp.,* 487 N.W.2d 499, 503 (Mich. 1992) (citation omitted). "Mere discussions and negotiations cannot be a substitute for the formal requirements of a contract." *Thomas,* 468 N.W.2d at 60 (citing *Kirchhoff v. Morris,* 275 N.W. 778 (Mich. 1937)). "[P]arties to a contract may contract to modify the contract by a later agreement." *Adell Broad. Corp. v. Apex Media Sales, Inc.,* 708 N.W.2d 778, 782 (Mich. Ct. App. 2005) (citing *Quality Products & Concepts Co. v. Nagel Precision, Inc.,* 666 N.W.2d 251, 257-58 (2003)). There must be mutual assent for the modification. *Id.*; *see also Port Huron Educ. Ass'n MEA/NEA v. Port Huron Area Sch. Dist.,* 550 N.W.2d 228, 326-27 (Mich. 1996).

"[A] party alleging waiver or modification must establish a mutual intention of the parties to waive or modify the original contract." *Quality Products,* 666 N.W.2d at 258. "Where mutual assent does not exist, a contract does not exist. Accordingly, where there is no mutual agreement to enter into a new contract modifying a previous contract, there is no new contract and, thus, no modification. Simply put, one cannot unilaterally modify a contract because by definition, a unilateral modification lacks mutuality." *Id.*

In this case, the parties directly contest whether there was mutual assent to the opposing party's alleged modifications of the Employment Agreement. There is no dispute that the

Employment Agreement was modified, apparently by oral agreement, to change Plaintiff's compensation plan from the original draw and commission plan to a salary and bonus (percentage of profits) plan, as evidenced by the bonus formula schedule cited by both parties (Def. Br., Ex. 2; Pl. Br., Ex. 1, Decl. of Ashraf Ebid, Ex. B). However, Defendant further contends that the Agreement was modified to eliminate the provision for post-termination commissions. And Plaintiff contends that the parties reached an oral agreement in April 2010 to further modify his compensation plan to increase his salary to $600,000 per year retroactive to January 1, 2010; and provide him a share of GFF profits of 10% of the first $50,000,000 of institutional profits, 5% on all institutional sales profits thereafter; and a share of profits on the remainder of GFF's profits (non-institutional) based on the then-existing percentages (Pl. Br. at 1-2)

Defendant has presented extensive evidence of numerous e-mail communications, letters, deposition testimony and other exhibits to support its contentions.[9] However, Plaintiff has provided evidence and persuasive argument in opposition to Defendant's contentions.

According to Plaintiff's Declaration and supporting exhibits, his initial "draw plus commission" compensation plan in the Employment Agreement was changed in 2004 or 2005 to a "salary plus a percentage of the profits of GFF" (Ebid Decl. ¶ 7). Beginning in 2004–2005, his role with Defendant began to expand greatly, as the Company expanded, and his responsibilities increased accordingly (*id.* ¶ 8). As his tasks on behalf of Tilkin to ensure the Company's profitability became increasingly difficult over the next several years, Plaintiff began the dialogue

---

[9]As noted above, Defendant contends that (1) no agreement was reached on the alleged April 2010 modification of Plaintiff's salary and bonuses; (2) the purported bonus formula is too indefinite to be enforced; (3) the Agreement's post-termination commission provisions were no longer in effect after Plaintiff's compensation was changed to a salary and bonus plan; and (4) Plaintiff was terminated for cause.

with Tilkin regarding Plaintiff's role and his compensation structure (*id.* ¶¶ 8-12). It took months to get Tilkin to finally reach an agreement in April 2010, which was made retroactive to January 1, 2010 (*id.* ¶ 13). The agreement was reached over the phone and was not memorialized in writing, and nothing was discussed between Plaintiff and Tilkin regarding changing the provisions in the Employment Agreement for compensation if he was terminated without cause, i.e., post-termination commissions (*id.*).

Plaintiff presents evidence of an electronic communication with Tilkin in May 2010, indicating that the implementation of the alleged new bonus plan was a matter of monthly numbers from accounting (Ebid Decl. ¶ 14, citing Ex. C). Plaintiff asserts that by June, it became clear to him that Tilkin was delaying payment of the agreed-upon bonuses (*id.* ¶ 16). He states that his employment was terminated shortly thereafter, and despite his inquiries to Defendant and Defendant's legal counsel, Plaintiff has never been paid the bonuses under his April 2010 agreement with Tilkin, which, based on company profit and loss spreadsheets, calculates to approximately $1,224,000 (*id.* ¶¶ 18, 21, citing Exs. F-J). Plaintiff's Declaration also states that he has not been paid the post-termination commissions to which he is entitled under the Employment Agreement, which can be computed based on the profit and loss spreadsheets and the formula in the Agreement (*id.* ¶¶ 22-23, citing Ex. J).

Significantly, Plaintiff points out that it is uncontested that he received payment of his $600,000 per annum salary for the period January 1, 2010 until his termination (Pl. Br. at 8, citing Def. Br., Ex. 31). Plaintiff's increase in salary from $150,000 to $600,000 was purportedly part of the agreement reached in April 2010. In addition to the ample contested evidence of the parties' endeavors to finalize a new salary and bonus/profit sharing plan for Plaintiff in early 2010, this

evidence is persuasive in raising a genuine issue regarding whether the negotiations consummated in an overall agreement for a new salary and bonus/profit sharing plan as alleged by Plaintiff.

With regard to Defendant's contention that Plaintiff was terminated for cause, the issues of fact are even more glaring and contentious. Defendant cites evidence of "cause," as defined under the Employment Agreement, that during his employment with Defendant, "Plaintiff referred to co-workers and customers as being 'stupid,' 'lazy jerks,' 'idiots,' 'assholes,' useless,' inept' and 'losers'" (SMF ¶ 19); "Plaintiff referred to one of the company business partners as being a 'shit President' and a 'super idiot,' and threatened to 'teach him a lesson'" (*id.* ¶ 35); "Plaintiff referred to certain business partners as being 'stupid,' 'dishonorable,' 'foolish,' and 'primitive,' and made comments such as 'screw him if he will try this shit with me' and 'I will make them pay'" (*id.* ¶ 36); in emails, "Plaintiff referred to staff members as 'lazy jerks,' 'idiot[s],' 'assholes[s],' or 'useless'" (*id.* ¶ 37); Plaintiff disparaged employees (*id.* ¶¶ 38-40); Tilkin advised Plaintiff in an email "to 'watch some of the people you copy on email while you scold' other members of the leadership team" (SMF ¶ 46); and employees complained of Plaintiff's behavior and conduct, including that he was tyrannical and dictatorial (*see, e.g.*, *id.* ¶¶ 50-55). Defendant further cites numerous instances of behavior and comments by Plaintiff that Defendant contends constitutes "cause" for termination under the Employment Agreement.

Plaintiff does not dispute much of this evidence, but he also cites evidence that his actions were induced by Tilkin, who designated Plaintiff the "bad guy" to deal with employee deficiencies and do whatever was necessary to ensure company profitability, permitting Tilkin to remain "above the fray" (Ebid Decl. ¶¶ 8-11). Plaintiff argues that whether he was terminated for "cause" is a contested issue of material fact to be decided by a jury. The Court agrees.

Contrary to Defendant's argument, the evidence is not overwhelming in establishing that Defendant had just cause to terminate Plaintiff's employment. Whether Defendant's reason for terminating Plaintiff's employment was the true reason for his discharge and whether that constituted termination for cause cannot be decided as a matter of law on the evidence before the Court. *See Toussaint v. Blue Cross & Blue Shield of Mich.,* 292 N.W.2d 880, 895 (Mich. 1980).

### B. Plaintiff's Remaining Claims

For the same reasons discussed above, with respect to Plaintiff's breach of contract claim, the Court concludes that there are genuine issues of material fact concerning Plaintiff's New Jersey Wage Payment Law claim and his Unjust Enrichment claim. The factual evidence underlying the course of Plaintiff's employment with Defendant is extensive. Much of the evidence, and more importantly, its import concerning the claims presented, is contested. Given the disputes regarding Plaintiff's compensation, and the limited argument, the Court is not persuaded by Defendant's argument that Plaintiff's claims fall outside the New Jersey Wage Payment Law because that law applies to only "wages" and "commissions" and does not apply to the incentives and bonuses claimed by Plaintiff.

With respect to the unjust enrichment claim, there is no dispute concerning the general rule that a claim of unjust enrichment does not apply if there is an express contract. *See Able Demolition v. Pontiac,* 739 N.W.2d 696, 702 n.4 (Mich. Ct. App. 2007). However, given the contested issues regarding the parties' express contract, if any with respect to the various compensation claims, the Court cannot conclude at this juncture that Plaintiff's unjust enrichment claim fails as a matter of law.

IV.  Conclusion

The wealth of evidence in this case raises genuine issues of material fact with respect to each of Plaintiff's claims and precludes judgment as a matter of law.  Defendant's Motion for Summary Judgment is therefore properly denied.

An Order consistent with this Opinion will be entered.


DATED: October 4, 2012				  /s/ Janet T. Neff				
							JANET T. NEFF
							United States District Judge